**No. 25-50717**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

SAMANTHA LIEDTKE,
*Plaintiff-Appellant,*

v.

THE CITY OF AUSTIN,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Western District of Texas – Austin Division
Cause No. 1:23-CV-803-RP

---

PLAINTIFF-APPELLANT'S BRIEF

---

Rebecca Webber
Texas Bar No. 24060805
WEBBER LAW
4228 Threadgill Street
Austin, Texas 78723
512-537-8833
rebecca@rebweblaw.com
Rebecca Webber

Holt M. Lackey
State Bar No. 24047763
holt@holtmajorlackey.com

Amaris I. Diaz
State Bar No. 24144444
amaris@holtmajorlackey.com
HOLT MAJOR LACKEY, PLLC
111 W. Anderson Ln., Ste. D-211
Austin, Texas 78752
Telephone: (737) 808-2260

ATTORNEYS FOR PLAINTIFF-APPELLANT SAMANTHA LIEDTKE

1

## CERTIFICATE OF INTERESTED PERSONS

### No. 25-50717

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

SAMANTHA LIEDTKE,
*Plaintiff-Appellant,*

v.

CITY OF AUSTIN,
*Defendant-Appellee.*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Local Rule 26.1.1, the undersigned counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

**Plaintiff-Appellant:**                    Samantha Liedtke

**Counsel for
Plaintiff-Appellant:**                      Holt Lackey of Holt Major Lackey,
                                            PLLC, Austin, TX

                                            Amaris Diaz of Holt Major Lackey,
                                            PLLC, Austin, TX

                                            Rebecca Webber of Webber Law,
                                            Austin, TX

**Defendant-Appellee:**                     City of Austin, Texas


**Counsel for
Defendant-Appellee:**                       Sara Schaefer of City of Austin,
                                            Austin, TX

                                            Christine Reinhard of Schmoyer
                                            Reinhard, L.L.P., San Antonio, TX

                                            Michael Ritter of Schmoyer Reinhard,
                                            L.L.P. San Antonio, TX

                                            Abigail Madrigal of Schmoyer
                                            Reinhard, L.L.P. San Antonio, TX



                                            */s/ Holt M. Lackey*
                                            Holt M. Lackey

                                            *Counsel for Plaintiff-Appellant
                                            Samantha Liedtke*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully submits that the issues of law are important and the factual record voluminous, and that oral argument would be beneficial to the Court in deciding this appeal.

TABLE OF CONTENTS

Table of Authorities............................................................................1

Jurisdictional Statement ....................................................................5

Statement of the Issues......................................................................6

Statement of the Case........................................................................8

   A.    Introduction.................................................................8

   B.    Factual Background....................................................10

     1.    Liedtke's Tenure was Pervaded by Harassment and Hostility from her All-Male Shiftmates. ....................10

     2.    The Daily Hostility Escalated to Outright Bullying and Refusals to Work with Liedtke, Which Placed her in Danger. ................................................................12

     3.    Despite this Mistreatment, Liedtke Earned Stellar Evaluations and Promotion from Previous Supervisors...........16

     4.    Liedtke Complains to her new Sergeant McBee.........................16

     5.    The Men on the Shift Retaliate with Vague, False, and Cherry-Picked "Officer Safety" Accusations. ...............19

     6.    The Four Incidents the Men Texted McBee, which Became the ESP, Were Cherry-Picked, False, and/or Stale. ................................................................20

     7.    The False and Retaliatory Allegations are Adopted as Discipline Against Liedtke.........................26

   C.    Procedural History.....................................................30

Summary of the Argument ....................................................................... 32

Argument ............................................................................................... 37

   I.    A Reasonable Jury Could Find that the ESP was an
        Adverse Employment Action Under the *Burlington*
        Standard. ................................................................................ 37

     A.    Standard of Review ..................................................... 39

     B.    An Action that Might Dissuade a Reasonable Worker is
         an Adverse Employment Action Under the Supreme
         Court's Standard for Retaliation. ................................. 40

     C.    The Bright-Line Standard Applied by the District Court
         is Prohibited by *Burlington*. ........................................ 43

     D.    This Particular ESP was Egregiously Retaliatory in
         Context. ....................................................................... 46

  II.    Under the Rule 56 Standard a Reasonable Jury Could
        Find for Plaintiff on her Discrimination and Retaliation
        Claims. .................................................................................. 60

     A.    Recent Supreme Court and Other Circuit Court Cases
         Question the *McDonnell Douglas* Framework ........... 60

     B.    The District Court Exclusively Evaluated the Cross-
         Motions for Summary Judgment Under the *McDonnell
         Douglas* Framework .................................................... 63

Conclusion ............................................................................................ 68

Certificate of Service ............................................................................ 70

Certificate of Compliance ..................................................................... 71

# TABLE OF AUTHORITIES

**PAGE(S)**

## Cases

*Ames v. Ohio Dep't of Youth Servs.,*
605 U.S. 303 (2025) ................................................................ 60, 62, 65

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................................ 39

*Anthony v. Donahoe,*
460 F. App'x 399 (5th Cir. Feb. 13, 2012) ................................... 63, 64

*Badgerow v. REJ Properties, Inc.,*
974 F.3d 610 (5th Cir. 2020) ........................................................ 50, 63

*Bailor v. Taylor,*
*170 F. Supp. 2d 466 (D. Del. 2001)* ................................................. 65

*Berry v. Crestwood Healthcare,*
84 F.4th 1300(11th Cir. 2023) ......................................................... 62

*Burlington N. & Santa Fe Ry. Co. v. White,*
548 U.S. 53 (2006) ......................................................... 31, 39, 40, 41

*Comcast Corp. v. National Assn. of African American-Owned Media,*
589 U.S. 327 (2020) ........................................................................ 60

*Downey v. Isaac,*
*622 F. Supp. 1125 (D.D.C. 1985)* ................................................... 65

*Griffith v. Des Moines,*
387 F.3d 733 (8th Cir. 2004) ........................................................... 61

*Hamilton v. Dallas Cnty.,*
79 F.4th 494(5th Cir. 2023) ......................................................... 43, 59

1

*Harrison v. Brookhaven Sch. Dist.*,
  82 F.4th 427 (5th Cir. 2023) .................................................................. 43

*Hittle v. City of Stockton*,
  145 S. Ct. 759 (2025) ............................................................................ 60

*Ismael v. Roundtree*,
  No. 25-10604, 2025 WL 3492930 (11th Cir. Dec. 5, 2025) .................. 61

*Laurent-Workman v. Wormuth*,
  54 F.4th 201 (4th Cir. 2022) ................................................................ 52

*Mayberry v. Vought Aircraft Co.*,
  55 F.3d 1086 (5th Cir. 1995) ................................................................ 52

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) .............................................................................. 50

*Moore v. U.S. Dep't of Agric.*,
  55 F.3d 991 (5th Cir.1995) .................................................................... 46

*Moye v. Tregre*,
  No. 22-30341, 2024 WL 65424 (5th Cir. Jan. 5, 2024) ....................... 43

*Postal Service Bd. of Governors v. Aikens*,
  460 U.S. 711 (1983) .............................................................................. 62

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) .............................................................................. 62

*Rayborn v. Bossier Parish School Board*,
  881 F.3d 409 (5th Cir. 2018) ................................................................ 38

*Roberson v. Alltel Info. Servs.*,
  373 F.3d 647 (5th Cir.2004) .................................................................. 48

*Rogers v. Bromac Title Servs., L.L.C.,*
　755 F.3d 347 (5th Cir. 2014) ...................................................................... 38

*Saketkoo v. Administrators of Tulane Educational Fund,*
　31 F.4th 990 (2022) .................................................................................... 38

*Septimus v. Univ. of Hous.,*
　399 F.3d 601 (5th Cir. 2005) ...................................................................... 50

*Smith v. Lockheed-Martin Corp.,*
　644 F.3d 1321 (11th Cir. 2011) .................................................................. 61

*Stone v. Par. of E. Baton Rouge,*
　329 F. App'x 542 (5th Cir. 2009) ................................................................ 46

*Swierkiewicz v. Sorema N. A.,*
　534 U.S. 506 (2002) .................................................................................... 62

*Trans World Airlines, Inc. v. Thurston,*
　469 U. S. 111 (1985) ............................................................................ 46, 62

*Tynes v. Florida Dept. of Juvenile Justice,*
　88 F.4th 939 (11th Cir. 2023) .................................................................... 60

*Vance v. Ball State Univ.,*
　570 U.S. 421 (2013) .................................................................................... 62

*Wilson v. Tregre,*
　787 F.3d 322 (5th Cir. 2015) ...................................................................... 38

*Yazdian v. ConMed Endoscopic Techs., Inc.,*
　793 F.3d 634 (6th Cir. 2015) ...................................................................... 52

*Zamora v. City of Houston,*
　798 F.3d 326 (5th Cir. 2015) ...................................................................... 48

## Statutes

28 U.S.C. § 1291 ...............................................................................4

28 U.S.C. § 1331 ...............................................................................4

## Rules

FED. R. CIV. P. 56 ................................................................. 35, 38, 64, 65

## JURISDICTIONAL STATEMENT

This appeal is taken from a July 30, 2025, final judgment of the United States District Court for the Western District of Texas, Austin Division, in Case No. 1:23-CV-803-RP, granting summary judgment to Defendant on all claims, thereby disposing of all parties' claims and defenses.

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellant brought federal claims under Title VII.

This Court has jurisdiction under 28 U.S.C. § 1291 because the District Court's final judgment resolved the case in its entirety. The notice of appeal was timely filed on August 29, 2025, within the period prescribed by Federal Rule of Appellate Procedure 4(a).

This appeal is properly before the United States Court of Appeals for the Fifth Circuit because the Western District of Texas sits within this Circuit.

## STATEMENT OF THE ISSUES

1.    Whether the District Court erred by applying a bright-line rule that an Employee Success Plan (ESP) can never constitute an "adverse employment action" under Title VII's antiretaliation provision, rather than applying the Supreme Court's context-specific "reasonable worker" standard.

2.    Whether the District Court impermissibly conflated the standards governing Title VII's antidiscrimination and antiretaliation provisions by applying the narrower antidiscrimination standard for an "adverse employment action" to Appellant's retaliation claim.

3.    Whether, viewing the evidence in the light most favorable to Appellant, a reasonable jury could find that the issuance of the ESP—for which both the direct and circumstantial evidence of retaliatory intent is unusually strong—might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

4.    Whether direct evidence of retaliatory intent—namely, officers' admission that they approached the sergeant because they were concerned Appellant would file an EEOC complaint—together with circumstantial evidence, precludes summary judgment.

5.    Whether the District Court erred in evaluating Defendant's motion for summary judgment in accordance with the *McDonnell Douglas* framework exclusively, instead of analyzing the motion under the Rule 56 standard.

## STATEMENT OF THE CASE

### A.     Introduction

There is little doubt that the Employee Success Plan issued against Officer Samantha Liedtke in January 2021 originated and was motivated by retaliation to silence her complaints about unequal treatment as the only woman on the all-male Edward 400s shift of the Austin Police Department.

The Men doing the retaliation said as much out loud. "*The first thing* that Officer Colaianni told [Sergeant McBee] in [the] conversation [in which he first made the allegations that became the ESP] was that he and the other men on the shift were concerned that Officer Liedtke would file an EEOC complaint against him." ROA.2770 (emphasis added). Officer Colaianni admitted this retaliatory purpose in a January 13, 2021, meeting, less than one week after Officer Liedtke had spent an hour meeting with the new-to-the-shift Sergeant McBee to complain about the increasingly untenable and pervasive unequal treatment she had received on the otherwise all-male shift. *See* ROA.2770.

Sergeant McBee took the men's word reflexively: copying, pasting, and adopting verbatim their inaccurate accounts of cherry-picked,

months-old incidents that had already been addressed under previous leadership into the ESP. *See* ROA.2771-2779. Such a retrospective, hearsay-based ESP was irregular and unprecedented in APD policy. Thus, the male harasser's openly retaliatory allegations against Officer Liedtke were adopted wholesale as formal discipline against her.

The District Court's opinion did not question that the ESP was motivated by retaliation and substantively informed by retaliation. It is little disputed that it was so motivated, and at a minimum, the evidence is more than sufficient for a jury to conclude that it was so motivated.

Rather, the District Court reasoned that, as an ESP, it categorically did not rise to the level of an "adverse employment action" as a matter of law. This legal conclusion cannot be squared with the Supreme Court's rejection of such bright-line tests for retaliatory adverse employment actions. Furthermore, the District Court's exclusive use of the *McDonnell Douglas* framework instead of the Rule 56 standard when ruling on Defendant's motion for summary judgment was erroneous.

### B.    Factual Background

#### 1.    Liedtke's Tenure was Pervaded by Harassment and Hostility from her All-Male Shiftmates.

In January 2020, Liedtke graduated from the Austin Police Academy and was given the "Honor Cadet" award for outstanding achievement in academics, defensive tactics, and fitness. ROA.2546.

Liedtke was recruited to the previously all-male Edwards 400s patrol shift by APD higher-ups out of an express desire to diversify the shift, who believed that "this shift needed a female officer." ROA.2610. The all-male shift environment into which Liedtke was placed was an unusually close-knit and closed-off unit. Liedtke's shift was described by a supervisor: "the majority of the shift is one [Academy] class and they are very close to each other because of this. They are also friends . . . inside and outside of work. They are a close-knit, tight shift." ROA.2610, 2612. Stephenson, Colaianni, and Miller each testified that the men on the shift were exceptionally close friends. *See, e.g.,* ROA.2717-2718.

The effort to diversify the Edward 400s shift by assigning a single female officer to it did not go well. In meetings at the beginning and end of each Edwards 400 shift, Liedtke's all-male shift mates would engage in daily "locker-room banter" about women colleagues' police work,

10

physical appearances, and sexuality. *See* ROA.6179-6180. Near-daily sexist comments from shift members and the Corporal leading meetings regularly included demeaning remarks about female officers in general and female officers who complained about sexism specifically. ROA.2651-2652. Her male shiftmates frequently ridiculed Sergeant Pamela McBee (behind McBee's back) for her weight. They criticized Lieutenant Daniel (behind Daniel's back) for being a mother. Officer Liedtke was told by a male colleague: "Don't be like [Lt. Daniel]. She's not a real cop. She barely did 2 years on the streets and then alternated between getting pregnant and promoting." *Id.*

On another occasion, Officer Liedtke was the only woman present during a Showdown meeting with five male colleagues where a woman colleague was called a slut and a "butterface" (a crude term meaning a woman's body is attractive "but her face" is not). *Id.*

Officer Liedtke was warned not to associate with a specific female colleague because she had made a hostile workplace complaint, and Liedtke "did not want to associate with people like that." ROA.6181. She was told that if she associated with a harassment victim, then she would

be "associated with drama" and would not receive promotions or preferred assignments.

Liedtke was questioned about her contraception practices by a male peer who was concerned that her hormonal birth control would affect her ability to gain muscle. ROA.7265. She was repeatedly told by at least five male peers that all female Austin police officers are "either a bitch or a slut" and one colleague even suggested that "it's better to be a bitch than a slut in his opinion." *See, e.g.,* ROA.7261-7263.

Despite Liedtke never once alluding to her Academy "Honor Cadet" accolade, both of the shift's ringleaders harassed her about it. Pruitt was recorded telling Liedtke, "Like, you were Honor Cadet. Fucking awesome. Congratulations. That's great." ROA.6773. Colaianni misogynistically dismissed Liedtke's accomplishment as based on looks: "pretty women get easy accolades." ROA.2656.

### 2. The Daily Hostility Escalated to Outright Bullying and Refusals to Work with Liedtke, Which Placed her in Danger.

Beyond harassing and sexist words and jokes at Showup and Showdown meetings, the mistreatment of Liedtke by her all-male

12

shiftmates took forms that directly impacted Officer Liedtke's safety and ability to do her job.

On a daily basis, her male shiftmates ostracized and imperiled Officer Liedtke by forcing her to ride alone on patrol while they all rode in pairs. ROA.7719. Officers on the shift were not assigned a specific vehicle or patrol partner but were allowed to decide for themselves how to pair up and split the available patrol vehicles. ROA.7515. Officer Liedtke completed her Field Training Officer phase in May 2020 and was allowed to ride with her male shiftmates only four times in June and July. ROA.2540. Every other day of her tenure, and every single day that Officer Liedtke worked patrol from July 7, 2020, through January 28, 2021, she worked alone while her male shiftmates doubled up. *Id.*

Liedtke's all-male peers made her do all the shift's grunt work of taking calls and writing reports while they "hunted" for stolen vehicles and were otherwise "proactive" to "get the cool arrests." ROA.6384. This pattern was described by one witness: "She didn't get a lot of help, like, taking calls or if she went to a call, it was more her handling the entire thing." ROA.2626.

13

Ironically, and illustrative of the Catch-22 in which Liedtke's shiftmates placed her, the alleged "officer safety incidents" that would make up the ESP were largely incidents in which Officer Liedtke had supposedly responded to calls without backup. But it was her shiftmates who forced her to ride solo virtually every day while they all paired up, and the evidence shows it was her shiftmates who refused to provide her backup on calls. ROA.7515; ROA.7489.

The ongoing tensions between Officer Liedtke's devotion to responding to citizen calls and her shiftmates' preference to "hunt" for proactive arrest opportunities rather than backing her up on those calls came to a frightening head on November 11, 2020. ROA.7320; ROA.7678; ROA.7074-7076.

On that day, Liedtke was responding to a call when she saw Officers Pruitt and Wilkes' patrol car parked in a head shop parking lot, running plates in hopes of finding a warrant rather than answering the citizen calls. Liedtke messaged her shift mates via her patrol car's in-car computer: "yall can hunt once we clear some more threes... this is what sarge was talking about lol." ROA.2644. Two minutes later, Pruitt, who was doubled-up with Wilkes, messaged Liedtke: "call me." ROA.6415.

14

Wilkes testified that he and Pruitt "were both upset and offended by the message" so they told Liedtke to meet them in a parking lot. ROA.2635.

For about twenty minutes in the darkened and secluded parking lot, Officers Pruitt and Wilkes berated Officer Liedtke in crude and threatening terms. Pruitt told Liedtke that "You look fucking horrible" and continued in a "very inappropriate" and "disparaging" manner to chastise her. *See also* ROA.6987 Pruitt inadvertently recorded the rest of the incident, including Wilkes's statement to Liedtke that "we're gonna drop belts." ROA.7288-7293; ROA.6771-6781; ROA.2646. Liedtke interpreted the "belts" comment in the moment as a threat to beat her up. Pruitt was officially reprimanded for his behavior toward Liedtke. ROA.6987.

Immediately after this confrontation, Pruitt and Wilkes refused to back up Liedtke on a dangerous shoot/stab hotshot call. ROA.7293. Officers from a completely different sector were forced to respond from further away. ROA.7294. Pruitt claimed later that he was in the bathroom and not available to respond. But Pruitt admitted in his deposition that he was sitting outside the 7-11 for seven minutes before

15

he used the bathroom and that it would only have taken three minutes to back up Liedtke. *See* ROA.2734.

### 3. Despite this Mistreatment, Liedtke Earned Stellar Evaluations and Promotion from Previous Supervisors.

Despite this work environment, Liedtke completed her field training in the fastest time possible, 90 days, with uniformly high positive evaluations. Liedtke's fourteen Field Training evaluations from February 16, 2020, through May 19, 2020, praise her progress, attitude, professionalism, proficiency in law, policy, and procedure, and "exceptional" performance. ROA.2670-2692.

Once Liedtke graduated to solo patrol status in May 2020, her monthly evaluations from June 2020 to January 2021 were—just like her prior weekly evaluations—full of praise. ROA.2695-2703. Just as she had at the Academy, Liedtke earned a good reputation from her Austin Police Department colleagues (other than her shiftmates). *See, e.g.,* ROA.2711.

### 4. Liedtke Complains to her new Sergeant McBee

Liedtke had expressed concerns about disparate treatment and hostility throughout her tenure on the Edward 400s. Corporal Stephenson was aware that Liedtke was being treated differently because of her sex and would commiserate with her during her field

training "about the role of female police officers because his wife was a female police officer." ROA.7282.

After the November 11, 2020, incident in which she was cornered and then willfully not backed up by Pruitt and Wilkes, Liedtke went to Corporal Stephenson to more specifically complain about the hostile work environment that had now become a risk to her safety. ROA.7296. Liedtke complained to Corporal Stephenson about Pruitt's and Wilkes's behavior. Corporal Stephenson was alarmed because "this is obviously something that needs to be brought to a supervisor's attention" and decided to hold a mediation between Liedtke and Pruitt/Wilkes. ROA.2603.

The "mediation" amounted to little more than a meeting between the offending officers and Officer Liedtke, which Liedtke felt was "one-sided" and which resulted in little more than an admonition to "agree to disagree." ROA.2629; ROA.2758. Corporal Stephenson took no other action, testifying to APD Internal Affairs that he did nothing further because the Edward 400s shift would have new supervisors in a few weeks (Stephenson was slated to retire at the end of 2020). ROA.2605. He testified that he told the shift, "Hey talked to Sergeant McBee. She

17

said that she will take care of everything when she gets here." *Id.* Liedtke was upset by this, "Stephenson had made promises that things were going to change. Things were not changing. And so Stephenson was retiring." ROA.7297.

Liedtke then complained to APD peer support, who advised, "When you get your new sergeant, report [how you have been mistreated] to your new sergeant." *Id.*

When Sergeant McBee arrived on the Edward 400s shift at the beginning of 2021, Officer Liedtke hoped that the discrimination and bullying she had endured would finally be addressed.

And so, in early January, on Sergeant McBee's second or third day on the shift, Officer Liedtke brought her concerns to Sergeant McBee, as Corporal Stephenson and peer support had advised her. *Id.* McBee also recalled that Liedtke very quickly "approached me [to] let me know that she was experiencing issues with members of the shift." ROA.2757.

The meeting lasted "about an hour." ROA.7639 *et seq.*

McBee remembered that Liedtke "brought forth all these issues that she said she had experienced prior to my arrival on the shift" and "she told me about peer support that she had reached out to, and they

18

advised her she should let me know what had been going on." ROA.7064; ROA.2767.

McBee also recalled learning from Liedtke that "the mediation session did not go well." ROA.2766. McBee testified that Liedtke told her about the meditation on Jan. 7, 2021 "that, um, they didn't come to a resolution, uh, about the actual situation. They did come to a res-resolution to agree to disagree, but to put it behind them and move forward." ROA.7031.

### 5.    The Men on the Shift Retaliate with Vague, False, and Cherry-Picked "Officer Safety" Accusations.

The fact that Liedtke and McBee were together at the same location for an hour on Jan. 7, 2021, was displayed on each of Liedtke's male shiftmates' in-car computers. ROA.7314-7316. The meeting took place during the patrol shift, when every shift car's location is visible to every other, so the hour-long proximity of Liedtke and McBee's cars while neither was on a call was plain to all. Liedtke testified that: "So everybody saw our locations together for an hour, where I'm not on a call and she's not on a call, we're sitting together for an hour out in the field, and that I know that they saw our locations together." ROA.7315. On

19

January 13, not a week later, Sergeant McBee was visited again. ROA.2756.

This time, it was Officer Colaianni who had been on parental leave. The "first thing" that Officer Colaianni said to Officer McBee in this second visit was "that he and the other men on the shift were concerned that Officer Liedtke would file an EEOC complaint against him." *Id.*; *see also* ROA.2770.

The rest of the conversation consisted of a laundry list of the Men's grievances against Officer Liedtke, and a plea that Sergeant McBee intercede on their behalf.

At Sergeant McBee's request, the Men then sent her text messages detailing sundry incidents: months old, already addressed by previous supervisors, texted from the Men's memory, and narrated with their bias. ROA.2756; *see also, e.g.,* ROA.6840-6846.

### 6. The Four Incidents the Men Texted McBee, which Became the ESP, Were Cherry-Picked, False, and/or Stale.

A number of the details the Men gave McBee were flatly contradicted by the body worn camera footage of the incidents in question. Confronted in deposition with the inaccuracies in the versions

20

they texted to McBee, the Men themselves would later sheepishly admit that their accounts were "misremembered" and "not completely accurate." ROA.6916.

The discrepancies between the men's accounts and the body worn camera footage were not minor tricks of the memory. They were wholesale retaliatory revisionist histories conjured from memory in a way that revealed that the men had simply brainstormed any past incidents that they could characterize as showing "officer safety issues," then exaggerated to emphasize the alleged "officer safety issues" even at the expense of accuracy.

For example, the men's text to McBee and subsequently McBee's almost-verbatim ESP (with minor stylistic changes only, such as referring to Liedtke as "PPO" per departmental style policy) included the following account of an October 4, 2020, incident:

> PPO responded to a Disturbance between individuals alleging that a Male was performing sexual acts on their underage Sister. Prior to additional units arriving on scene, Officer Liedtke began interacting with numerous individuals inside of the residence, many of whom were located directly behind her. When additional units arrived on scene, a large "butcher-style" knife was observed and subsequently removed from a media console located within the immediate lunge-able

21

area of all individuals, including the Primary aggressors, on-scene.

In deposition, Officer Colaianni admitted that his account of this incident, as transcribed first in Pruitt's text to McBee and then almost-verbatim in the ESP, had been "misremembered." Considering the number of discrepancies between his account and the body worn camera footage, "misremembered" was an understatement.

Among the "misremembered" details to which Colaianni admitted in deposition after viewing the BWC were: that Officers Heil and Kyle had arrived virtually simultaneously with Officer Liedtke; that the scene was largely secure and the "primary aggressor" already detained in the parking lot (and so was not in lunging distance of anything let alone a knife) by the time Officer Colaianni arrived a few minutes later; that Officer Colaianni (as well as officers Heil, Kyle, and Liedtke) were on the scene for at least about 12 minutes before any of them spotted the knife; that Officer Liedtke was engaged with the victim while Colianni and another officer had her back and were responsible for securing the scene; that Colaianni was stationed at the door of the apartment for about 9 minutes before he even spotted the knife on the console, that after spotting the knife he merely moved it to the kitchen sink where it

22

remained equally in reach of everyone on the scene;  that the so-called "butcher-style" knife was actually a "pretty typical kitchen knife"; that the alleged "officer safety error" was "not just her" but equally the other officers on the scene; and that he did not report the incident, or recall even talking to Officer Liedtke about it at the time. ROA.6896-6916

Indeed, Colaianni apparently did not do anything about the incident until having the opportunity to "misremember" it in inflammatory and misleading terms two months later as part of the effort to build a retaliatory case against Officer Liedtke.

Similarly, the male officers' texts and Sergeant McBee's copy and paste of that text into the ESP described a November 28, 2020, incident as follows:

> PPO responded to a Disturbance HS between a male and a female. PPO arrived on scene and made contact with the female Victim, who had obvious signs of visible injury and was the sole occupant of a vehicle. PPO then requested that her back up officers check the immediate area for the outstanding Suspect. After the backup officers left the scene, an unidentified female arrived on scene with the PPO giving car keys to the victim telling her a male gave them to her and ask her to give them to the victim. PPO only asked direction of travel of this male from the unidentified female then confirmed the suspect description with the victim. PPO then left the Victim alone going in the

23

direction where the unidentified female advised she last saw this male. PPO made a stop on a Male who did NOT match the description given for the Suspect. Once it was determined that this male was NOT the Suspect, all Officers returned to the original scene but the Victim was NOT located. This same unidentified female from earlier told the PPO that as soon as she left the scene in her patrol vehicle, the actual Suspect returned, forced his way into the Victim's vehicle prior to the vehicle leaving the scene. Several minutes later, the backup officers re-located the Victim, who was again the sole occupant of the vehicle. The Victim confirmed the above information but failed to cooperate in order to further the investigation.

Similar to the October 4 incident that Officer Colaianni admitted to "misremembering" in the narrative that became the basis for the ESP, Officer Pruitt admitted in his deposition, after watching body-worn camera footage, that the November 28, 2020, incident was more "nuanced" and "weird" than the one-sided narrative he sent to Sergeant McBee, which she copied and pasted essentially verbatim (including his idiosyncratic and argumentative capitalization) into the ESP. ROA.2772-2777. After admitting confusion and discrepancies about what the victim and the "independent witness' said, as well as the complicated and changing narratives, descriptions, and names that he and Liedtke were both given about the perpetrator by both the victim and the third-party

24

witness, Officer Pruitt ultimately agreed that his recollection of the incident upon which he drafted the language that became the ESP was "not completely accurate." ROA.6170 at n.149.[1]

The first incident listed in the Men's text and subsequently McBee's ESP was the most superannuated and previously addressed of all of the incidents. Officer Liedtke does not dispute that she made an error on May 20, 2020 (one of her first days riding solo after completing her training) by giving a ride to juveniles stalled on the side of the highway without frisking all of them. But this event was self-reported by Officer Liedtke immediately after it happened in May to her then-supervisors, who noted the issue on her monthly report, counseled her to be careful and learn from the incident, but did not issue any further discipline. *See* ROA.2540. No similar incident of Officer Liedtke failing to find a weapon on a suspect had occurred again, and the other incidents inaccurately cherry-picked by the Men on the shift bore little to no resemblance to this one bona fide error.

---

[1] Exhibit 17 to Docket 50 cannot be located in the record on appeal, but footnote 149 accurately quotes the relevant deposition.

**7.     The False and Retaliatory Allegations are Adopted as Discipline Against Liedtke**

On January 18, 2025, Sergeant McBee copied and pasted the Men's retaliatory and inaccurate texts essentially verbatim and issued them as an ESP to Officer Liedtke. *See, e.g.,* ROA.2772-2777.

It was unusual, to the point of unprecedented, for a Sergeant to issue a vague "officer safety" ESP based on cherry-picked months-old incidents that occurred under and were addressed by a previous supervisor. Sergeant McBee admitted she had never issued such a retrospective disciplinary action, and Lieutenant Daniel testified that, if she had known the context and genesis of the ESP, she would never have signed it. ROA.2736-2737.

Disregarding the "normal" process, McBee reviewed only the retaliators' cherry-picked incidents. And the descriptions of those incidents on the ESP demonstrate that she did not even review those incidents "independently" or discuss them with her predecessor supervisors before copying and pasting Officer Pruitt's text accounts, which even the retaliators admitted were "misremembered" and "not completely accurate." *See, e.g.,* ROA.2778. An "independent" review of the

26

body-worn camera footage would have resulted in an accurate description of the events rather than verbatim copying of inaccurate accounts.

For example, as to the October 4, 2020, "knife" incident, McBee only reviewed Liedtke's BWC footage, in which the knife is never visible. McBee admitted she did not know whether she personally saw the knife in the video (she could not have), but nonetheless copied and pasted Officer Pruitt's misleading description of the event almost verbatim, including describing what Officer Colaianni admitted was an "ordinary kitchen knife" as "a large 'butcher-style'" knife and omitting any mention of the 13 minutes that elapsed before any of the four officers at the scene even noticed the knife. ROA.2774-2777.

Similarly, as to the November 28, 2020, incident, McBee's ESP narrative adopted Officer Pruitt's narrative almost verbatim (down to the idiosyncratic and argumentative capitalization), even though Officer Pruitt admitted after watching Officer Liedtke's BWC footage that this account was "not completely accurate." The ESP thus repeats Pruitt's mistakes even as to such important details as whether the victim or third-party witness made statements attributed to the victim in the false narrative, and the fact that there were two wildly different descriptions

27

of the alleged perpetrator. Thus, while McBee may have viewed Officer Liedtke's BWC footage, she conclusively did not do so as part of any "independent investigation." If she had reviewed the BWC footage "independently," she would have put an accurate account in her ESP.

Even as to the May 20, 2020, incident, Sergeant McBee admitted in deposition that her ESP account contained numerous inaccuracies, from minor disparities such as saying that a subject was running when he was walking, to more fundamental inaccuracies such as misunderstanding and misstating which of the subjects ultimately was found to have a weapon. This long-past incident had been addressed extensively with the previous supervisors, with whom Sergeant McBee did not even check before adopting the retaliators' version. *See* ROA.6366.

As to the other incidents, Sergeant McBee admitted in deposition that she did not discuss the incidents or any prior counseling or guidance issued with her predecessors as Liedtke's supervisors, who had been aware of, had discussed with Liedtke, and had recorded the incidents in her monthly reviews per standard probationary officer procedure. ROA.2762.

Sergeant McBee was unable to identify in deposition any department precedent for issuing an ESP retroactively for events that had occurred under a previous supervisor or for events as much as 8 months in the past that had been previously addressed. In his report, Plaintiff's expert Travis Norton buttressed the conclusion that such a retrospective ESP based on cherry-picked incidents from over the course of almost a year on the force was unusual and unfair. ROA.6973-6985.

Equally unusual, Sergeant McBee and Lieutenant Daniel then continued to modify and edit the ESP even after they had issued it and even after Officer Liedtke had resigned, in an effort to strengthen its legitimacy and "assembl[e a] defense" of themselves after Officer Liedtke made allegations of pervasive discrimination (up to and including issuance of the ESP) in her resignation email. There are at least three versions of the ESP in the record, each subsequent version slightly modified from the previous version. The evidence strongly suggests that the final, most extensive version was only assembled after Officer Liedtke resigned, claiming discrimination and retaliation.

In a February 2, 2021, text chain, McBee and Daniel discussed the allegations in Liedtke's resignation email, and only then did Daniel ask

29

McBee about "Sam bringing up more officer safety incidents during" their January 25 meeting. Daniel requested that McBee "send those" to her, explaining, "This is me assembling my defense of you."

The additional incident Liedtke had raised in the January 25 meeting to which Lieutenant Daniel was referring was the November 11, 2020 incident in which Pruitt and Wilkes had cornered and threatened Liedtke before willfully refusing to back her up on a hotshot call. Liedtke had raised the incident in her meeting with McBee and Daniel as an example of her mistreatment rather than as an "officer safety incident." Yet in the version of the ESP bearing the date of February 2, 2021, the latest-dated version, this incident appears for the first time as an additional alleged instance of "officer safety issues" on Liedtke's part.

## C.   Procedural History

On July 16, 2023, Plaintiff-Appellant Samantha Liedtke filed suit in the United States District Court for the Western District of Texas, Austin Division, Cause No. 1:23-CV-803-RP, against the City of Austin, bringing claims under Title VII for sex discrimination, hostile work environment, and retaliation.

30

After conducting discovery, on June 4, 2025, the Parties cross-filed motions for summary judgment, with Plaintiff-Appellant Liedtke seeking summary judgment only on the issue of retaliation, and Defendant City of Austin seeking summary judgment on all three of Liedtke's claims.

On July 30, 2025, the District Court denied Plaintiff-Appellant Liedtke's motion for summary judgment and granted summary judgment in favor of the City of Austin on all claims. That same day, the District Court entered a Final Judgment in favor of Defendant.

On August 29, 2025, Plaintiff-Appellant timely filed this appeal to the United States Court of Appeals for the Fifth Circuit, where the case has been docketed as No. 25-50717.

## SUMMARY OF THE ARGUMENT

The District Court erred by applying a bright-line rule that an Employee Success Plan ("ESP") cannot be an "adverse employment action" for purposes of Title VII's antiretaliation provision. The Supreme Court has directly rejected such a bright line test in favor of a fact-specific standard that asks whether the employer action in question "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (internal quotation marks omitted). The District Court's analysis that ESPs categorically cannot be "adverse employment actions" for purposes of the antiretaliation provision violates *Burlington*'s requirement of a general test that looks to the full facts surrounding any given employer action because "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69.

The context here provides unusually clear, compelling, and direct evidence that the motivation, purpose, and intent of this ESP was to dissuade Plaintiff-Appellant Liedtke from making a charge of discrimination. About one week after Officer Liedtke met with her new

32

Sergeant, Pamela McBee, to describe the hostile work environment she had endured for the previous nine months as the only female officer on the Edward 400s shift, her male shiftmates *sua sponte* presented a hodgepodge of months-old grievances to McBee expressly because they "were concerned that Officer Liedtke would file an EEOC complaint."

The Sergeant, who had not been Liedtke's supervisor at the time the alleged incidents occurred and were addressed by her predecessors, quite literally adopted the retaliating male shiftmates' admittedly inaccurate accounts of these incidents *verbatim* by copying and pasting their descriptions of the incidents. In deposition, these same male shiftmates admitted that the argumentative, slanted accounts of the incidents they cherry-picked from nine months of working with Officer Liedtke were inconsistent with body-worn camera footage of the incidents and were "misremembered" and "not completely accurate."

The ESP issued by Sergeant McBee was not only based on inaccurate recollections of incidents cherry-picked by Liedtke's retaliators, but it was procedurally irregular in a number of ways. Sergeant McBee admitted that she had never retrospectively issued (nor was she aware of any other Sergeant ever issuing) an ESP for months-

old alleged conduct or for incidents that had entirely occurred under and been addressed by previous supervisors. Expert testimony offered by Officer Liedtke opined that the incidents did not substantively justify an ESP and were irregular procedurally. And perhaps most irregular, Sergeant McBee and Lieutenant Daniel continued to revise and edit the ESP to "assembl[e a] defense" of their actions after Officer Liedtke tendered her resignation. Bizarrely, and apparently out of confusion and/or a desire to pile as many incidents as possible to legitimize the ESP, these revisions included the addition of an incident that Officer Liedtke had reported to them as an instance of her male colleagues harassing her.

The ESP was so substantively weak and so procedurally irregular that Lieutenant Daniel even agreed in her deposition that if she had known that it was initiated by the men on the shift out of concern that Officer Liedtke would go to the EEOC and that Sergeant McBee had merely copied and pasted those same men's accounts into the ESP, she never would have signed it.

In this context, Officer Liedtke was reasonable to believe that the ESP was an act of retaliation and that she would never receive fair treatment under a Sergeant willing to verbatim adopt false accounts of

34

cherry-picked incidents in order to discipline Liedtke because they were afraid she would go to the EEOC.

A reasonable worker would be dissuaded from making a charge of discrimination by the issuance of an ESP based on false accounts of cherry-picked incidents, copied word-for-word from men who brought the incidents to their Sergeant specifically because they were afraid she would go to the EEOC.

Accordingly, applying the *Burlington* standard, this bad-faith and retaliatory ESP was an "adverse employment action" for purposes of the antiretaliation provision.

Additionally, the District Court erred by applying the *McDonnell Douglas* framework exclusively in granting summary judgment against Liedtke on her discrimination and retaliation claims. Justice Thomas recently questioned whether *McDonnell Douglas* is a suitable tool for evaluating Title VII claims at summary judgment, noting that the framework was developed for bench trials and lacks textual grounding in Title VII, and  that, in his view, the framework is incompatible with the summary-judgment standard. In a very recent, the Eleventh Circuit has recognized that a plaintiff may defeat summary judgment without

satisfying *McDonnell Douglas* if the totality of circumstantial evidence would allow a jury to infer intentional discrimination or retaliation, describing this sufficiency as a "convincing mosaic" in line with the standard proscribed in Federal Rule of Civil Procedure 56.

The District Court granted summary judgment, concluding that the Liedtke, Plaintiff-Appellant failed the "adverse employment action" element at the prima facie stage for both discrimination and retaliation. It solely applied the McDonnell Douglas framework rather than conducting an independent Rule 56 analysis to determine whether the evidence—viewed in the light most favorable to the Plaintiff-Appellant—raises a genuine dispute as to any material fact regarding her discrimination and retaliation claims.

## ARGUMENT

### I.    A Reasonable Jury Could Find that the ESP was an Adverse Employment Action Under the *Burlington* Standard.

The evidence of retaliation is unusually strong in this case.

When the Men of the Edward 400s shift approached Sergeant McBee on January 13, 2021, they declared their retaliatory intent openly. Sergeant McBee testified that "the first thing that Officer Colaianni told me in that conversation was that he and the other men on the shift were concerned that Officer Liedtke would file an EEOC complaint against him." The rest of the conversation consisted of a laundry list of the Men's grievances against Officer Liedtke, and a plea that Sergeant McBee intercede on their behalf.

At Sergeant McBee's request, the Men then sent her text messages detailing sundry incidents: months old, already addressed by previous supervisors, texted from the Men's memory, and narrated with their bias.

A number of the details the Men gave McBee were flatly contradicted by the body-worn camera footage of the incidents in question. Confronted in deposition with the inaccuracies in the versions they texted to McBee, the Men themselves would later sheepishly admit

37

that their accounts were "misremembered" and "not completely accurate."

Sergeant McBee then copied and pasted the Men's retaliatory and inaccurate texts verbatim and issued them as an ESP to Sergeant Liedtke. It was unusual to the point of unprecedented for a Sergeant to issue a vague "officer safety" ESP based on cherry-picked months-old incidents that occurred under and were addressed by a previous supervisor. Sergeant McBee admitted she had never issued such a retrospective disciplinary action, and Lieutenant Daniel testified that, if she had known the context and genesis of the ESP, she would never have signed it.

Equally unusual, Sergeant McBee and Lieutenant Daniel continued to modify and edit the ESP even after they had issued it and after Officer Liedtke had resigned, in an effort to buttress its legitimacy and "build [a] defense" following Officer Liedtke's allegations in her resignation letter.

The District Court erred by ignoring all of this evidence and context of retaliation and entering judgment based on a bright-line rule. The District Court's opinion turns on the conclusion that an ESP can never

38

be an "adverse employment action," no matter how strong the evidence that the ESP was retaliatory. By applying this bright-line rule, the court disregarded the evidence that retaliation was the intent, substance, and effect of this particular ESP.

## A.      Standard of Review

This Court reviews a District Court's grant of summary judgment *de novo. Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Saketkoo v. Administrators of Tulane Educational Fund*, 31 F.4th 990, 997 (2022). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.*

"In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party." *Rayborn v. Bossier Parish School Board*, 881 F.3d 409, 414 (5th Cir. 2018); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015). If

39

"a reasonable jury could return a verdict for the nonmoving party," summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.      An Action that Might Dissuade a Reasonable Worker is an Adverse Employment Action Under the Supreme Court's Standard for Retaliation.**

The District Court's analysis cannot be squared with *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). *Burlington* directly rejects a bright-line test because "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69.

The Supreme Court's standard for an "adverse employment action" in the retaliation context looks to the totality of the facts and circumstances to determine whether the employer's action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68. Applying the correct standard, the retaliation is clear and is proven with both direct and circumstantial evidence.

The Supreme Court has held that whether an employer action is an "adverse employment action" for purposes of Title VII's antiretaliation

provision is not a bright-line test under which certain actions categorically are or are not always "adverse employment actions." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).

In formulating this standard, the Supreme Court expressly rejected any standard that (i) treats the definition of "adverse employment action" for purposes of the antiretaliation provision as coterminous with the antidiscrimination provision, or (ii) limits actionable retaliation to "ultimate employment decisions." *Id*. at 67.

The Supreme Court's standard is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id*. at 69.

The Supreme Court elaborated on the importance of this general, objective "reasonable employee" standard in terms that make perfectly clear that even employer actions that may be considered trivial in some contexts may be sufficient to dissuade a reasonable employee from reporting discrimination, and thus meet the standard, in other contexts:

> "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." A schedule change in an employee's work schedule

41

may make little difference to many workers, but may matter enormously to a young mother with school age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." *Id.*

Despite this clear Supreme Court precedent, the District Court granted summary judgment on Plaintiff-Appellant Liedtke's antiretaliation claims applying an analysis that: 1) treated "adverse employment action" as coterminous in the antiretaliation and antidiscrimination contexts; 2) applied a bright-line rule that an Employee Success Plan ("ESP") could never constitute an "adverse employment action" for antiretaliation purposes, and 3) failed to analyze the context in which the Austin Police Department issued the ESP to Officer Liedtke under the standard of whether, in context, it "might well dissuade a reasonable worker from making a charge of discrimination."

42

The District Court relied on a combination of pre-*Burlington* Fifth Circuit precedents requiring an "ultimate employment action," Fifth Circuit cases applying the narrower standard for "adverse employment actions" in the antidiscrimination context, and Fifth Circuit dicta suggesting that "generally" a written reprimand "alone" will not constitute an "adverse employment action" in the antiretaliation context. This analysis overlooks the Supreme Court's mandate in *Burlington* that courts construe "adverse employment actions" more broadly in the antiretaliation context and look to the full circumstances to determine whether the employer's action, in context, might well have dissuaded the employee from reporting discrimination.

**C.      The Bright-Line Standard Applied by the District Court is Prohibited by *Burlington*.**

**1.      The District Court Conflated the Standards for Antidiscrimination and Antiretaliation.**

The District Court's opinion treated "adverse employment action" as coterminous in the antiretaliation and antidiscrimination contexts, an approach that was expressly rejected by *Burlington*. Specifically, the District Court began from the premise that "[b]oth Liedtke's sex discrimination and retaliation claims require her to prove an adverse employment action," and then proceeded to analyze that question as a

43

matter of law applying the same antidiscrimination standards for both Liedtke's antidiscrimination and retaliation claims. ROA.8717.

### 2. The District Court Erroneously Applied a Bright-Line Rule.

The District Court's opinion rest on the erroneous application of a bright-line rule that an Employee Success Plan ("ESP") could never constitute an "adverse employment action" for antiretaliation purposes.

Specifically, the District Court relied on Fifth Circuit antidiscrimination precedents to derive a single standard that it applied to both Liedtke's discrimination and retaliation claims, namely that an "adverse employment action" "must 1) involve a meaningful difference in the terms of employment and 2) injure the affected employee." ROA.8718 (citing *Hamilton v. Dallas Cnty.*, 79 F.4th 494(5th Cir. 2023); *Moye v. Tregre*, No. 22-30341, 2024 WL 65424 (5th Cir. Jan. 5, 2024); *and Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427 (5th Cir. 2023)).

With no mention of the *Burlington* standard of whether a reasonable worker might have been dissuaded by the issuance of a flagrantly retaliatory and false ESP immediately after making a complaint of discrimination, the District Court instead applied a bright-line test that "corrective or remedial measures do not constitute adverse

employment actions unless they 'affect job title, grade, hours, salary, or benefits or cause a diminution in prestige or change in standing among coworkers." ROA.8718.

*Burlington* forecloses such a bright-line rule in favor of a general test looking to the full facts and context to determine whether a reasonable worker might be dissuaded. The text and intent of Title VII, as explained and analyzed in *Burlington*, draw a distinction between the substantive provision of Title VII, which seeks to prevent injury to individuals based on their status, and the antiretaliation provision, which seeks to prevent harm based on conduct.

### 3.     The District Court Failed to Analyze the ESP and its Effect on a Reasonable Worker in Context.

The District Court opinion failed to analyze the context in which the Austin Police Department issued the ESP to Officer Liedtke under the standard of whether, in context, it "might well dissuade a reasonable worker from making a charge of discrimination."

The District Court never reached the question of whether the ESP might dissuade reports of discrimination because it erroneously applied a bright-line standard based on a belief that an ESP categorically can never be an "adverse employment action." The opinion does not cite

*Burlington* or its "dissuade a reasonable worker" standard. While grants of summary judgment are reviewed *de novo* in any case, this is not a case in which Appellant is asking the Court of Appeals to disagree with or revisit the District Court on any factual determinations or application of the facts to the law because the District Court never considered the facts relevant to whether a reasonable worker would view the ESP as retaliatory. Instead, the District Court mistakenly applied a bright-line test of the employer action's category instead of the required general objective test of the employer action's effect in the full context.

It is thus for this Court to determine, not only *de novo* but for the first time, whether in the full context of this case a reasonable jury could conclude that the ESP might well have dissuaded a reasonable worker in Liedtke's position from bringing a charge of discrimination to her employer or the EEOC.

### D.    This Particular ESP was Egregiously Retaliatory in Context.

#### 1.    Direct Evidence Supports the Retaliation Claim.

##### a.    The Retaliatory Intent of the Shiftmates' Was Explicitly Stated.

The overwhelming bulk of the caselaw discussing the standards for proving a case under the antiretaliation provision deals with the

46

sufficiency of circumstantial evidence. Nearly every case discusses the *McDonnell Douglas* burden-shifting framework for analyzing circumstantial evidence of retaliation.

Although, as discussed below, the circumstantial evidence withstands *McDonnell Douglas* burden-shifting scrutiny, that burden-shifting framework is not necessary here because the direct evidence of retaliatory intent is sufficient to survive summary judgment on its own and does not require an examination of the *McDonnell Douglas* framework. See *Trans World Airlines, Inc. v. Thurston*, 469 U. S. 111, 121 (1985) (holding that *McDonnell Douglas* is "inapplicable" when the plaintiff relies on direct evidence to prove his claim); see also *Stone v. Par. of E. Baton Rouge*, 329 F. App'x 542, 545 (5th Cir. 2009) (stating that where a plaintiff produces direct evidence of discrimination, he is entitled to bypass the *McDonnell Douglas* burden-shifting framework commonly applied in discrimination cases and proceed directly to the question of liability) (citing *Moore v. U.S. Dep't of Agric.*, 55 F.3d 991, 995 (5th Cir.1995)).

Here, officers expressly told the decisionmaker that they approached her because they were concerned that Appellant would file

an EEOC complaint, which constitutes direct evidence of a retaliatory motive tied to the challenged action. Sergeant McBee testified that "the first thing that Officer Colaianni told me in that conversation was that he and the other men on the shift were concerned that Officer Liedtke would file an EEOC complaint against him," before providing a list of grievances and asking McBee to intervene. McBee further recounted that the men texted her their incident narratives at her request, which she then used in preparing the ESP. Lieutenant Daniel likewise acknowledged that, when McBee initially briefed her, the male officers were "saying they're worried that Officer Liedtke is going to make a case about a hostile working environment against them."

*Burlington* distinguishes between the substantive provision of Title VII, which seeks to prevent injury to individuals based on their status, and the antiretaliation provision, which seeks to prevent harm based on conduct; that framing underscores why this overt retaliatory purpose is dispositive direct evidence under the correct standard.

> **b.  The Shiftmates' Retaliatory Intent Was Transferred to APD Leadership via the Cat's Paw Theory**

Appellant anticipates that Appellee may argue that Sergeant McBee and Lieutenant Daniel, the supervisors who actually signed and issued the ESP, did not share the male officers' retaliatory motives. Even if that were the case, it would not insulate Defendant from liability for the retaliatory animus of the male officers who initiated and effectively authored the ESP.

In *Zamora v. City of Houston*, the Fifth Circuit held that in the context of Title VII retaliation claims, "cat's paw" analysis is a viable theory of causation. 798 F.3d 326, 332-33 (5th Cir. 2015). Under the cat's paw theory, a plaintiff must establish that the person with a retaliatory motive somehow influenced the decision-maker to take the retaliatory action. In other words, a plaintiff must demonstrate that the individual with retaliatory animus used the decision-maker to take the desired retaliatory action. *Id.* at 331. To invoke the cat's paw analysis, Plaintiff must submit evidence sufficient to establish: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decision-maker. *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir.2004).

The influence wielded over the issuance of the ESP by the male officers is as unambiguous as their retaliatory animus. The ESP was set in motion by Officer Colaianni approaching Sergeant McBee during his parental leave, stating that the shiftmates' were concerned that Liedtke was going to go to the EEOC, and then the other members of the shift provided a curated and biased list of four incidents that had occurred over the prior eight months, when Sergeant McBee was not even assigned to the shift. Officer Liedtke's previous supervisors had already addressed the incidents, and there is absolutely no evidence that Sergeant McBee had any concerns about Officer Liedtke's performance before or independent of the male officers bringing them to her.

Nor did Sergeant McBee meaningfully apply independent judgment or analysis to the incidents that the male officers framed for her. She copied and pasted Officer Pruitt's text message descriptions directly into the ESP with only minor stylistic edits. The officers who had harassed and discriminated against Plaintiff for months, and who had the retaliatory animus for her having reported their conduct, and who explicitly expressed concern that she would go to the EEOC, are the ones who initiated the ESP, cherry-picked the evidence, and essentially

50

authored it. They did not merely "possess leverage" or "exert influence" over the ESP; they drove the process from start to finish.

### 2. Circumstantial Evidence Supports the Retaliation Claim.

For retaliation cases involving circumstantial evidence, courts look to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first meet the initial burden of showing a prima facie case that: (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) there exists a causal link connecting the protected activity to the adverse employment action. See *Badgerow v. REJ Properties, Inc.*, 974 F.3d 610, 618 (5th Cir. 2020). Once the plaintiff meets her initial burden, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. If the employer proffers a legitimate, nondiscriminatory reason, the burden then returns to the plaintiff to prove that the employer's reason is pretext for unlawful discrimination. See *Septimus v. Univ. of Hous.*, 399 F.3d 601, 607 (5th Cir. 2005).

### a. The ESP was Issued Almost Immediately After the Protected Activity

When Pamela McBee took over as the Sergeant for the Edward 400s in January 2021, Officer Liedtke took the first opportunity to complain in detail to McBee about the mistreatment by her male shiftmates. Liedtke remembers the meeting occurring on McBee's second day with the shift. McBee testified that Officer Liedtke came to her on January 7th. The meeting between Liedtke and McBee on Jan. 7, 2021, was "about an hour." Per McBee, Liedtke specifically named Pruitt, Wilkes, and Colaianni on Jan. 7, 2021. ROA.2768-2770.

The fact that Liedtke and McBee were together at the same location for an hour on Jan. 7, 2021, was displayed on each of Liedtke's male shiftmates' in-car computers. Liedtke testified that: "So everybody saw our locations together for an hour, where I'm not on a call and she's not on a call, we're sitting together for an hour out in the field, and that I know that they saw our locations together." ROA.7315.

McBee admitted that "Liedtke came to [McBee] with her concerns about Pruitt, Wilkes, and Colaianni before any of them ever came to [McBee] with their concerns about [Liedtke]." ROA.2768-2770. McBee also recalled that Liedtke very quickly "approached me [to] let me know that she was experiencing issues with members of the shift" on only

McBee's third day on the shift. ROA.7023. McBee remembered that Liedtke "brought forth all these issues that she said she had experienced prior to my arrival on the shift" and "she told me about peer support that she had reached out to, and they advised her she should let me know what had been going on." ROA.2767.

The Fifth Circuit has consistently held that temporal proximity alone can be a significant factor in establishing a causal link for a prima facie case of retaliation. See *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995) (stating that "the timing of the adverse employment action can be a significant, although not necessarily determinative, factor"). Indeed, other Circuits have stated that temporal proximity can be so significant as to constitute evidence of causal connection for the purposes of establishing a prima facie case of retaliation. See *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 650 (6th Cir. 2015) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."); *Laurent-Workman v. Wormuth*, 54 F.4th 201,

219 (4th Cir. 2022) ("[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action" may establish causation only if it is "very close.").

It was less than a week after this McBee-Liedtke meeting that the men on the shift approached Sergeant McBee because of their fear that Liedtke would "go to the EEOC." Less than a week after that, Sergeant McBee issued the ESP based on the verbatim and inaccurate accounts presented to her by the very men about whom Liedtke had complained. The temporal proximity in this case is stark and shocking.

Following the Jan. 7, 2021, meeting, McBee took no action to investigate or address Liedtke's complaints about her male peers. By contrast, when the men about whom Liedtke had complained came to McBee just six days later because they were afraid Liedtke would go to the EEOC, Sergeant McBee promptly took action to adopt their retaliatory, "misremembered," and "not completely accurate" accounts of cherry-picked incidents and issue discipline against Liedtke.

### b.    The Retaliatory Intent was Explicit.

Officer Colaianni approached McBee on Jan. 13, 2021, "and the first thing that Officer Colaianni told [McBee] in that conversation was that

he and the other men on the shift were concerned that Officer Liedtke would file an EEOC complaint.

On Jan. 13, 2021, when he came in to meet with McBee, Colaianni was officially on parental leave. He denied in his deposition being able to recall how he came to be in a work meeting while he was on leave. However, he admitted that he and Pruitt had discussed approaching McBee about Liedtke so "we would have talked in person at some point" about complaining about Liedtke. ROA.6865. McBee also remembers this detail that Colianni "advised me that Officer Pruitt actually had more detailed information" about Liedtke. ROA.7000. The coordinated approach by the men, as suggested by Colaianni's pointing McBee to Pruitt, was verified in both Pruitt's and Colaianni's depositions, in which they admitted discussing the incidents they would collect and send to McBee.

Lt. Daniel was also aware that Liedtke's shiftmates feared that Liedtke would bring a hostile work environment complaint against them: "when Sergeant McBee was initially briefing me on this, I believe she had used the word hostile work environment" and that McBee had told her the male officers were "saying they're worried that Officer Liedtke is

55

going to make a case about a hostile working environment against them." ROA.2937.

### c.   The ESP was Procedurally Unprecedented.

After the January 13 meeting, Officer Pruitt texted Sergeant McBee a list of criticisms of Liedtke's work performance. McBee then created an ESP that was word-for-word copied and pasted (with minor technical edits) from Pruitt's text messages.

An ESP is an employment discipline pursuant to Austin Police General Orders. McBee testified that an ESP can lead to termination. An ESP is thus a serious matter that a "reasonable worker" would want to avoid if at all possible, and capable of having a material coercive effect.

The ESP placed against Liedtke for months-old conduct that Liedtke's previous supervisors had already addressed was highly irregular. McBee admitted that she never even spoke to Liedtke's 2020 supervisors about Liedtke's work performance or how they had handled the incidents in Pruitt's text messages. McBee further admitted that she had never issued similar retrospective discipline for alleged conduct occurring on a previous supervisor's watch, nor was she aware of any APD precedent for such discipline.

Lt. Daniel, who signed off on the ESP, testified that she never would have allowed it if she had known that it was largely written by Liedtke's peers about whom Liedtke had just complained.

The record further shows McBee and Daniel modified and expanded the ESP even after issuance and after Liedtke's resignation to "assembl[e a] defense," including adding an incident Liedtke had reported as harassment as if it were her safety lapse. This *post hoc* bolstering of the ESP is not only irregular but also provides strong circumstantial evidence of the consciousness of guilt and the lack of a *bona fide* non-retaliatory reason for the ESP.

### d. The ESP Adopted the Retaliators' False Accounts.

The falsity of the accounts texted by the Men on the shift, which were copied and pasted into the ESP by Sergeant McBee, undermines any claim that the ESP was motivated by "some legitimate, non[-retaliatory] reason" under the *McDonnell Douglas* burden shifting framework. The irregular and unprecedented nature of the ESP for long-past prior-supervisor conduct similarly disproves any claim that the ESP was legitimate or not retaliatory.

57

Alternatively, the false accounts, the lack of precedent for a retrospective ESP, and the procedural irregularities from copying and pasting retaliators' narratives verbatim while continuing to edit in hopes of strengthening the ESP even after Officer Liedtke had resigned, citing complaints of discrimination, provide strong evidence that a jury could believe any alleged legitimate or non-retaliatory reason proffered by the City were mere pretense.

### e.     The ESP was the Culmination of a Long Pattern of Discrimination.

Liedtke endured pervasive sexist comments, ostracism, and safety-compromising practices on an all-male, close-knit shift, including being forced to patrol alone while others doubled up and refused to back her up, ending in a threatening confrontation on November 11, 2020, and a subsequent refusal to assist her on a dangerous hotshot call.

Despite this environment, she consistently received strong evaluations and progressed rapidly through training, which underscores that the ESP did not reflect her performance trajectory but rather a retaliatory pivot following her protected complaints. She followed chain-of-command and peer-support guidance to report to the new sergeant; the swift retaliatory response by her shiftmates and the Sergeant's adoption

of their narratives transformed longstanding discrimination into formalized discipline.

### 3. To a Reasonable Worker, the ESP's Message was Clear: Stop Complaining About Discrimination.

Under *Burlington*'s "reasonable worker" standard, an employer action is materially adverse if it "might well dissuade a reasonable worker from making or supporting a charge of discrimination." The timing, explicit retaliatory motive, procedural irregularities, substantive falsities, and the acknowledged disciplinary nature and potential career consequences of an ESP together would plainly deter a reasonable officer from engaging in protected activity.

Here, the ESP was initiated by her shiftmates expressly out of fear of an EEOC complaint, assembled through verbatim copying of their inaccurate accounts, issued within days of Liedtke's reports, and later expanded *post hoc* to "build a defense," even recasting an incident of harassment as a supposed safety lapse—all of which would signal to a reasonable worker that further complaints would be met with escalating discipline.

To a reasonable worker, the falsity of the narratives ginned up by her shiftmates would send a particularly chilling and dissuasive

message. This was no "de minimis workplace trifle." *Hamilton*, 79 F.4th at 505. Not only were Officer Liedtke's complaints to Corporal Stephenson, peer support, and ultimately Sergeant McBee unaddressed, but her report to Sergeant McBee was met almost immediately by a concocted, unprecedented, and tendentious formal discipline against her.

## II. Under the Rule 56 Standard a Reasonable Jury Could Find for Plaintiff on her Discrimination and Retaliation Claims.

In addition, or in the alternative, to the arguments presented above, this Court should find that, even if Appellant has been unable to make a prima facie case in order to satisfy the *McDonnell Douglas* framework, that this alone is not enough reason to grant summary judgment against her claims for discrimination and retaliation and therefore, the case should be reversed and remanded to the District Court so that the it can evaluate the case under the appropriate Rule 56 summary judgment standard.

### A. Recent Supreme Court and Other Circuit Court Cases Question the *McDonnell Douglas* Framework

In a recent case before the Supreme Court of the United States, Justice Thomas, in concurrence, expressed skepticism that the *McDonnell Douglas* framework is a "suitable tool for evaluating Title VII claims at summary judgment" and that, in his view, the framework is

incompatible with the summary-judgment standard. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 322 (2025) (Thomas, J., concurring). As Justice Thomas points out in his concurrence in *Ames*, the *McDonnell Douglas* framework is a judge-made evidentiary "tool" that was originally developed for courts to use in a bench trial. *Id.* at 319 (citing *Comcast Corp. v. National Assn. of African American-Owned Media*, 589 U.S. 327, 340 (2020)); see also *Hittle v. City of Stockton*, 604 U. S. ——, —— – —— ——, 145 S. Ct. 759, 760–761, 221 L.Ed.3d 425 (2025) (Thomas, J., dissenting from denial of certiorari).

The *McDonnell Douglas* frame has no basis in the text of Title VII or any other source of law and, as Justice Thomas points out in his *Ames* concurrence, "[the Supreme] Court has never attempted to justify [the *McDonnell Douglas* framework] on textual grounds." *Ames*, 605 U.S. at 320; see also *Tynes v. Florida Dept. of Juvenile Justice*, 88 F.4th 939, 952 (11th Cir. 2023) (Newsom, J., concurring) ("There's certainly no textual warrant in Title VII or the Federal Rules for so elaborate a scheme, and so far as I know, no one has ever even sought to justify it as rooted in either"), and *Griffith v. Des Moines*, 387 F.3d 733, 740 (8th Cir. 2004) (Magnuson, J., concurring).

Recently, the 11th Circuit has held that a plaintiff can still defeat a motion for summary judgment regardless of the *McDonnell Douglas* framework if she puts forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination or retaliation. *Ismael v. Roundtree*, No. 25-10604, 2025 WL 3492930, at *7 (11th Cir. Dec. 5, 2025). In the past, the 11th Circuit has held that *McDonnell Douglas* was "never []intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

In *Smith*, the 11th Circuit held (1) that a "plaintiff will *always* survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent" and (2) that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (emphasis added). The 11th Circuit has clarified that the "convincing mosaic" analysis is a stand-in for the Rule 56 summary judgment standard applied to employment

discrimination and retaliation claims. See *Berry v. Crestwood Healthcare*, 84 F.4th 1300, 1311(11th Cir. 2023).

Many courts, including the District Court in the case at bar, use the *McDonnell Douglas* framework as "the presumptive means of resolving Title VII cases at summary judgment" but this use has come without the Supreme Court ever considering, much less holding, that the framework is an appropriate tool for the task of summary judgment. *Ames* at 320–21.[2] In the final paragraphs of his concurrence in *Ames*, Justice Thomas encourages litigants and lower courts to proceed without the *McDonnell Douglas* framework as "[the Supreme Court] has never required anyone to use it." *Id.* at 326.

**B.    The District Court Exclusively Evaluated the Cross-Motions for Summary Judgment Under the *McDonnell Douglas* Framework**

---

[2] Over the years, the Supreme Court has taken steps to limit the relevancy and applicability of the *McDonnell Douglas* framework. See *Trans World Airlines, Inc.*, 469 U.S. at 121 (holding that the framework is "inapplicable" when the plaintiff relies on direct evidence to prove his claim); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989) (plurality opinion) (holding that the framework does not apply in Title VII mixed-motive cases); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002) (stating that the framework is inapplicable at the pleading stage); *Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (stating that the framework is inapplicable in deciding post-trial motions and explaining that a plaintiff need not satisfy the first step of the framework at trial); *Vance v. Ball State Univ.*, 570 U.S. 421, 444 445, and n. 13 (2013) (suggesting that the framework should not be referenced in jury instructions because it is too confusing).

In its opinion, the District Court tasked with deciding whether to grant summary judgment on both Plaintiff-Appellant and Defendant-Appellee's cross-motions for summary judgment exclusively relied on the *McDonnell Douglas* framework. As part of its utilization of the *McDonnell Douglas* framework, the District Court disposed of Plaintiff's discrimination and retaliation claims on the grounds that she was not able to demonstrate that there had been an adverse employment action taken against her and thus did satisfy the second prongs required to establish a prima facie case for her claims. See *Anthony v. Donahoe*, 460 F. App'x 399, 402 (5th Cir. Feb. 13, 2012) (cited by the District Court as authority for Liedtke's discrimination claim) and *Badgerow v. REJ Properties, Inc.*, 974 F.3d 610, 618 (5th Cir. 2020) (cited by the District Court as authority for Liedtke's retaliation claim).

Both of the cases the District Court relied on as authority in its granting of summary judgment against Liedtke establish that the elements of a prima facie discrimination or retaliation case are dictated by *McDonnell Douglas*. See *Badgerow*, 974 F.3d at 618 ("Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden to show: "(1) that [she] engaged in activity protected by Title VII, (2) that

an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action."); *Anthony*, 460 F. App'x at 402 ("Under [the *McDonnell Douglas*] framework, a plaintiff must first establish a prima facie case of discrimination by showing that: "(1) [s]he is a member of a protected class, (2) [s]he was qualified for the position at issue, (3) [s]he was the subject of an adverse employment action, and (4) [s]he was treated less favorably because of h[er] membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.").

The District Court concluded that Liedtke did not suffer an adverse employment action and accordingly entered summary judgment against Liedtke on all her claims without conducting an independent analysis of whether her evidence presented in response to the Defendant's motion for summary judgment met the standard set in Rule 56 of the Federal Rules of Civil Procedure even though she may not have, *arguendo*, been able to establish a prima facie case for discrimination or retaliation.

As discussed in the previous section, the Supreme Court has not held that the *McDonnell Douglas* framework is an appropriate tool for

the task of summary judgment. *Ames* at 320–21. The District Court's exclusive reliance on the prima facie elements under *McDonnell Douglas* is not aligned with the standard required in Rule 56.

The *McDonnell Douglas* framework, which courts have repeatedly stated is only applicable to cases in which the plaintiff relies only on circumstantial evidence to prove discrimination or retaliation, is particularly inappropriate here, where Liedtke's retaliation case relies on the direct evidence from the sworn testimony of the very Sergeant who issued the ESP.

Applying the Rule 56 standard, for all of the reasons stated above, a reasonable jury could find for Plaintiff on not only her retaliation claim, but each of her claims. Here, the retaliatory conduct was so egregious and its motive so unadorned that Liedtke reasonably saw no option but to resign. *See Bailor v. Taylor*, 170 F. Supp. 2d 466, 471 (D. Del. 2001); *Downey v. Isaac*, 622 F. Supp. 1125, 1133 (D.D.C. 1985), aff'd, 794 F.2d 753 (D.C. Cir. 1986) ("[I]n a retaliatory constructive discharge case . . .[the] retaliation constituted intolerable working conditions in which a reasonable person in similar circumstances would have felt compelled to resign.").

Although Plaintiff resigned, a reasonable worker in her position would have found it intolerable to continue to work in a police department in which her complaints about not receiving backup and being harassed by her coworkers were met not by any effort to rectify the situation and protect her safety, but by naked retaliation. As Officer Liedtke testified, she felt she had no choice but to resign because the de facto endorsement of her shiftmates' icing her out and refusing to have her back put her safety and the safety of crime victims at risk. *See* ROA.6571; ROA.7306-7308; ROA.7355-7357.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Samantha Liedtke respectfully requests that this Court reverse the judgment of the United States District Court for the Western District of Texas, remand this case for further proceedings consistent with the Court's opinion, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

*s/ Holt M. Lackey*
Holt M. Lackey
State Bar No. 24047763
holt@holtmajorlackey.com
HOLT MAJOR LACKEY, PLLC
111 W. Anderson Ln., Ste. D-211
Austin, TX 78752
(512) 949-9598
**ATTORNEY FOR PLAINTIFF-
APPELLANT SAMANTHA LIEDTKE**

## CERTIFICATE OF SERVICE

I certify that on December 10, 2025, I filed and served a true and correct copy of this brief via electronic service through the Court's CM/ECF system on all parties through counsel of record.

/s/ *Holt M. Lackey*
Holt M. Lackey

## CERTIFICATE OF COMPLIANCE

I certify that:

1.    This motion complies with the type-volume of FED. R. APP. P. 32(a)(7)(B) and Fifth Circuit Local Rule 27.4 because it contains 11,821 words, excluding any portions exempted by FED. R. APP. P. 32(f).

2.    This motion complies with the typeface and type-style requirements of FED. R. APP. P. 32(a)(5) and (a)(6) because it was prepared in Microsoft Office Word for Microsoft 365 in 14-point font, Century Schoolbook type style, except for footnotes, which are in 12-point font as permitted by Fifth Circuit Rule 32.1.

/s/*Holt M. Lackey*
Holt M. Lackey