No. 25-50717

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

SAMANTHA LIEDTKE,
*Plaintiff-Appellant,*

v.

THE CITY OF AUSTIN,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Texas – Austin Division
Cause No. 1:23-CV-803-RP

PLAINTIFF-APPELLANT'S REPLY BRIEF

Rebecca Webber
Texas Bar No. 24060805
WEBBER LAW
4228 Threadgill Street
Austin, Texas 78723
512-537-8833
rebecca@rebweblaw.com
Rebecca Webber

Holt M. Lackey
State Bar No. 24047763
holt@holtmajorlackey.com

Amaris I. Diaz
State Bar No. 24144444
amaris@holtmajorlackey.com
HOLT MAJOR LACKEY, PLLC
111 W. Anderson Ln., Ste. D-211
Austin, Texas 78752
Telephone: (737) 808-2260

ATTORNEYS FOR PLAINTIFF-APPELLANT SAMANTHA LIEDTKE

i

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................. ii

TABLE OF AUTHORITIES ................................................................. iiiii

SUMMARY OF THE ARGUMENT ........................................................1

ARGUMENT ..........................................................................................5

I.     Under *Burlington*, retaliatory context informs material adversity; the totality here is sufficient to reach a jury. ..........5

II.     *Welsh* and *Lemonia* are distinguishable; *Burlington* rejects categorical rules about performance plans..................11

III.     The ESP was indisputably an "action" ....................................19

IV.     Appellant has not waived her discrimination or constructive discharge claims.................................................20

V.     The *McDonnell Douglas* argument was not waived. ..............25

CONCLUSION .....................................................................................26

CERTIFICATE OF SERVICE ..............................................................28

CERTIFICATE OF COMPLIANCE .......................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailor v. Taylor,*
170 F. Supp. 2d 466 (D. Del. 2001) .......................................................24

*Burlington N. & Santa Fe Ry. Co. v. White,*
548 U.S. 53 (2006) ......................................................................... 1, 2, 14

*Donaldson v. CDB Inc.,*
335 Fed App'x 494 (5th Cir. 2009) ........................................................14

*Downey v. Isaac,*
622 F. Supp. 1125 (D.D.C. 1985) ..........................................................24

*Hamilton v. Dallas Cnty.,*
79 F.4th 494(5th Cir. 2023) ..................................................................25

*Lemonia v. Westlake Mgmt. Servs.,*
No. 22-30630, 2023 WL 6878915 (5th Cir., Oct. 18, 2023) ....... 2, 17, 18

*Muttahottil v. Gordon H. Mansfield,*
381 F. App'x 454 (5th Cir. 2010).........................................................19

*Paul v. Elayn Hunt Corr. Ctr.,*
666 F. App'x 342 (5th Cir. 2016).........................................................14

*Saketkoo v. Administrators of Tulane Educational Fund,*
31 F.4th 990 (5th Cir. 2022) ...................................................................3

*Stewart v. Miss. Transp. Comm'n,*
586 F.3d 321 (5th Cir. 2009)..............................................................14

*Welsh v. Fort Bend Indep. Sch. Dist.,*
941 F.3d 818 (5th Cir. 2019)...................................................... passim

## SUMMARY OF THE ARGUMENT

Appellee's brief, like the district court's opinion below, errs by ignoring *Burlington*'s requirement that the material adversity of an employment action must be considered in context to determine whether it might dissuade a reasonable employee from reporting discrimination.

Appellee continues to urge a bright-line categorical rule that a performance plan can never be actionable. This cannot be squared with *Burlington*, in which the Supreme Court rejected just such a bright-line rule.

Supreme Court precedent is clear that in analyzing the material adversity element, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).

Throughout its brief, and beginning with its statement of the issues, Appellee attempts to urge precisely the kind of bright-line rule that *Burlington* rejected, while Appellant urges the contextual analysis that *Burlington* demands.

Contrary to Appellee's statement of the issues number 1, the rule urged by Appellant is emphatically not a bright-line rule that an ESP is

1

*always* a materially adverse employment action. Rather, the test urged by Appellant is simply the analysis the Supreme Court mandates: that the materially adverse element must be analyzed in context to determine whether, under all of the circumstances, the specific act "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

Far from a bright line, this rule reconciles *Burlington* with the Fifth Circuit cases relied upon by Appellee, which hold that a performance improvement plan "*without more*" is not materially adverse. *Lemonia v. Westlake Mgmt. Servs.*, No. 22-30630, 2023 WL 6878915 at *7 (5th Cir., Oct. 18, 2023); *see also Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818 (5th Cir. 2019) (disposing of the retaliation claim based on causation rather than materiality).

The rule then is that material adversity depends on the effect on a reasonable worker in context, and there is no bright line in either direction. "Context matters," and materiality will "depend upon the particular circumstances." *Burlington*, 548 U.S. at 69. In some cases, such as those cited by Appellee, a performance plan without more will

not be sufficient. In others, such as this one, the context will make the dissuasive impact of an employment action palpable.

Whether a reasonable employee would be dissuaded from making a report by a particular action is ultimately a fact question for the jury. At the summary judgment phase, the question is whether there is sufficient evidence that a reasonable jury could return a verdict in favor of plaintiff on the question. *Saketkoo v. Administrators of Tulane Educational Fund*, 31 F.4th 990, 997 (5th Cir. 2022). As discussed in more detail below and in Appellant's opening brief, there is more than enough context here for a jury to find that the dissuasive intent and impact of the ESP would reasonably dissuade Officer Liedtke from continuing to make or support a charge of discrimination against her fellow officers.

In an attempt to square its proposed bright-line rule with *Burlington*'s express rejection of such rules in retaliation cases, in its third and fourth statements of the issues and throughout its argument, Appellee seeks to silo the intent element from the material adversity element, largely conceding that there is sufficient evidence of retaliatory intent but asserting that this evidence is irrelevant to the separate element of material adversity. But this ignores the fact, which under

*Burlington* must be considered, that the overwhelming evidence that the ESP was issued as part of a retaliatory scheme is part of the *context* that would lead a reasonable employee to find the ESP dissuasive. In context, the ESP's message and intent were that Officer Liedtke needed to stop complaining about sexist treatment by her fellow officers, and she reasonably understood it that way.

*Burlington*'s mandate to consider the context when analyzing the materiality element means that a defendant cannot simply ignore clear retaliatory and dissuasive context by siloing it under the intent element so that it can be ignored in the materiality analysis. The clear evidence of intent, combined with procedural irregularities such as the verbatim adoption of the harasser's false narratives, retroactive discipline for incidents long since addressed under previous supervisors, and the continuing retrofitting of the ESP even after Officer Liedtke's resignation, create a context that makes clear that this ESP was not an ordinary training document but a message that continued complaints or charges with the EEOC would be met with adverse employment actions. Officer Liedtke was reasonable to interpret that message as such, and

4

Lieutenant Daniel even admitted that if she had known that context, she would not have signed off on the ESP.

Appellee argues that "intent cannot replace action." Appellee's Br. At 14. But it cannot be disputed that the ESP *was* an action. And the nakedness of its retaliatory intent is part of the context that renders the ESP materially dissuasive. *Burlington* demands that this context be considered.

Under *Burlington*, this context matters, and the record here—direct evidence of retaliatory motive, procedural irregularities, and substantive inaccuracies copied verbatim into an ESP immediately after protected complaints—raises a triable dispute that the ESP would dissuade a reasonable officer from reporting discrimination.

## ARGUMENT

I.  **Under *Burlington*, retaliatory context informs material adversity; the totality here is sufficient to reach a jury.**

*Burlington* directs courts to evaluate the action's real-world impact "in context." The City's attempt to wall off the "intent" element and treat the all-but-conceded retaliatory intent as immaterial to the "material adversity" element misreads *Burlington*: purpose, timing, process, and

5

workplace realities are precisely the "surrounding circumstances" that reveal whether a reasonable worker would be deterred.

The ESP is a materially adverse employment action under *Burlington*. Applying *Burlington*'s objective, contextual standard, this ESP would deter a reasonable officer from making discrimination complaints.

While some disciplinary documents such as ESPs or PIPs may fall short of "material adversity" in different *contexts*, such as the contexts in the *Lemonia* and *Welsh* cases upon which Appellee relies, the context here shows that both the intent and the impact of *this* ESP were to send a retaliatory and dissuasive message that would be unmistakable to Officer Liedtke and any reasonable officer.

A number of unusual and specific facts combine to render the dissuasive intent and impact of this ESP unmistakable. These include that the retaliatory motive was stated directly (ROA.2770), near-immediate temporal proximity (ROA.2756; *see also* ROA.2770), verbatim adoption of inaccurate allegations generated by the very coworkers about whom Officer Liedtke had complained (ROA.2771–2779), and procedural irregularities (ROA.2736—2737, ROA.6973—6985), including post-hoc

bolstering (indeed, post-resignation bolstering, undermining any alleged "training" purpose and demonstrating consciousness of guilt) of the paperwork (ROA.6973-6985).

This context transforms the ESP from neutral "training" into coercive discipline, signaling that complaints will be punished. Any reasonable employee would understand that signal: Complain about your coworkers' sexist mistreatment to your Sergeant, and your Sergeant will bust you back in trainee status based on demonstrably false allegations copied verbatim from the accounts of your harassers. Future efforts to address the mistreatment could be expected to be met with similar, and likely escalating, bad-faith siding with the complained-of party rather than the complaining party. This would dissuade a reasonable employee from making another complaint or from believing that there was any prospect of having her complaints addressed. No categorical safe harbor for performance plans shields such conduct.

Under *Burlington*, contextual, fact-specific analysis—rather than categorical rules—controls. This Court should reject the City's categorical treatment of ESPs and remand for adjudication under *Burlington*'s fact-specific standard. Appellant's record—detailing the

hostile backdrop, safety-related ostracism, protected complaints (ROA.2768-2770), explicit retaliatory intent ((ROA.2770), and the swift, irregular, and inaccurate ESP issued in response (ROA.2756, *see also* ROA.2770; ROA.2771–2779; ROA.2736–2737, 6973–6985; ROA.6896–6916, 2772–2777, 6170 at n.149[1])—shows that the Department intended to convey, and that Officer Liedtke reasonably received, the message that the victim would be blamed for any complaints and that she should not continue those complaints.

The City's effort to reduce ESPs to a non-adverse category mirrors the district court's error.

A. *The Retaliation here was immediate and expressly intended to prevent further complaints.*

Within days of Appellant's hour-long meeting with Sergeant McBee reporting mistreatment, a male officer told the sergeant that he and others were concerned Appellant would file an EEOC complaint, and, at the sergeant's request, the men texted incident narratives that were then used to prepare the ESP. ROA.2770–2779.

---

[1] Exhibit 17 to Docket 50 cannot be located in the record on appeal, but footnote 149 accurately quotes the relevant deposition.

Sergeant McBee testified that "the first thing" the officer told her was that the men "were concerned that Officer Liedtke would file an EEOC complaint," immediately followed by their curated list of incidents used to generate the ESP. ROA.2770.

### B. *Procedural irregularities and lack of independent review*

The ESP was assembled by copying and pasting the men's texts, referencing months-old incidents that had already been handled by prior supervisors, who were not consulted. *See* ROA.2771–2779. The ESP was later modified post-issuance, even recasting an incident Appellant reported as harassment *against* her as a safety lapse *by* her.

### C. *Substantive inaccuracies and post-hoc bolstering*

The men later admitted their accounts were "misremembered" or "not completely accurate" when compared to body-worn camera footage, yet those accounts were adopted verbatim into the ESP and then expanded in a later-dated version. *See* ROA.6896–6916; ROA.2772–2777; ROA.6170 at n.149[2].

---

[2] Exhibit 17 to Docket 50 cannot be located in the record on appeal, but footnote 149 accurately quotes the relevant deposition.

9

### D. *A reasonable officer would be deterred by such naked retaliation.*

Taken together, these facts indicate that protected complaints lead to formal discipline built on co-worker animus and inaccuracies, with management endorsement and retroactive bolstering—an obvious disincentive to further protected activity. That is materially adverse under *Burlington*.

The City relies on dicta suggesting that PIPs alone, "without more," will often not be materially adverse, but *Burlington* forbids per se rules.

Appellee concedes that the district court did not cite *Burlington*. Appellee is correct that merely not citing *Burlington* would not be errot. But more importantly, the district court did not ***apply*** *Burlington*, holding that the ESP was not a materially adverse action as a matter of law without considering the context and its effect on a reasonable worker.

Appellant agrees with Appellee that this Court must now apply *Burlington* de novo. Applying *Burlington*, the swift and sure retaliatory message delivered by an irregular and immediate ESP, verbatim adopting the complained-of officers' inaccurate allegations against Officer Liedtke, and effectively demoting her to probationary status eight

months after she had graduated to riding alone, makes the retaliatory message and material adversity plain.

## II.    *Welsh* and *Lemonia* are distinguishable; *Burlington* rejects categorical rules about performance plans.

The City's reliance on decisions treating routine PIPs as non-adverse ignores the distinguishing features here. Unlike those cases, this ESP followed immediately after protected complaints (ROA.2768-2770); was triggered by coworkers' stated fear of an EEOC charge (ROA.2770); was adopted verbatim from those accused officers' inaccurate texts about alleged long-past and previously addressed incidents (ROA.2771–2779); bypassed normal vetting (See, e.g., ROA.2778. ROA.2774-2777; ROA.6366); and was expanded post-issuance to defend management, including adding an incident Appellant had cited as harassment. *Burlington*'s "context matters" instruction forecloses the Appellee's per se approach.

The City invokes *Welsh* and *Lemonia* to contend that plans like ESPs are not materially adverse "alone." But this ESP is not "alone" in the abstract; it is embedded in unusual facts—a context that makes the retaliatory intent and impact palpable to any reasonable officer in Officer Liedtke's shoes.

11

Unlike a routine prospective coaching plan, this ESP was reverse-engineered from peers' retaliatory texts, copied nearly verbatim, and targeted months-old incidents that had already been addressed under prior supervision. The very supervisors who signed the ESP admitted that such retroactive superannuated ESPs were irregular, as was any verbatim copying of the officer texts that Sargeant McBee solicited after Officer Liedtke's complaints and after Officer Colaianni told her the men were concerned that Liedtke would next go to the EEOC. ROA.2770–2779, ROA.2736-2737. These aspects of the ESP were so irregular that Lieutenant Daniel testified that if she had known about this context, she never would have signed off on the ESP. ROA.2736-2737.

After Appellant resigned, citing discrimination and retaliation, leadership modified the ESP, including recasting an incident Appellant identified as harassment as an "officer safety" critique—underscoring the punitive, signaling function of the ESP in this context.

These features—clear causation and near-immediate temporal impact, direct retaliatory purpose, irregular procedure including verbatim adoption of the harasser's incorrect recall of months-old

12

incidents, and reputational/career signaling—distinguish this case from *Welsh*/*Lemonia* and satisfy *Burlington's* objective, contextual test.

*Welsh* and *Lemonia* stand only for the proposition that a performance plan alone, without more in the way of context showing dissuasive impact, will not be sufficient to meet the material adversity element. Both can be distinguished here.

First and foremost, *Welsh* is a case about causation, not the materiality of the adverse employment action. *Welsh* expressly did "not decide whether the [performance plan] was a retaliatory adverse employment action" because there was "no causal relationship," and an eight-month gap in time between the protected activities and the issuance of the performance plan. *Welsh*, 941 F.3d at 827. Thus, *Welsh* simply did not reach the issue for which Appellee seeks to cite it— whether a performance plan could, depending on the context, be a materially adverse employment action under *Burlington.*

In disposing of the retaliation claim on the basis of causation rather than material adversity, *Welsh* correctly noted in dicta that its earlier determination that the performance plan categorically was not an ultimate employment action giving rise to a discrimination claim did not

13

resolve the question of whether it was a retaliatory adverse action because "[f]or purposes of Title VII's anti-retaliation provision, the Supreme Court has held that an adverse employment action is defined slightly more broadly than the term is defined in the employment discrimination context" and "need not rise to the level of ultimate employment decisions." *Id.* at 826 (citing *Burlington*, 548 U.S. at 67-68; *Donaldson v. CDB Inc.*, 335 Fed App'x 494, 506 (5th Cir. 2009)).

The *Welsh* court noted that in applying the *Burlington* materiality standard of whether, in context, the specific employment action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," courts "look to indicia such as whether the action affected job title, grade, hours, salary, or benefits or caused a diminution in prestige or change in standing among... coworkers." *Id.* at 827 (citing *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 346 (5th Cir. 2016) and *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009)) (internal quotation marks omitted).

Officer Liedtke's case does not suffer from any of the infirmities that doomed Ms. Welsh's retaliation claim.

14

Most importantly, the causal connection, which doomed the claim in *Welsh*, is glaringly clear here. Not only was the ESP issued within weeks of Officer Liedtke's protected activity (ROA.2756), but the officers who brought the "misremembered," i.e., false, allegations against Officer Liedtke said out loud that the reason for their report was fear that she would go to the EEOC. *See* ROA.2770.

Sergeant McBee knew that was the motive behind the male officer's accounts, but she adopted them verbatim anyway, even though they were so inaccurate that even the men who had originally wrote them admitted that they were inaccurate when confronted with video of the incidents in deposition. This was about retaliation, not training.

Many of the indicia of adversity identified and found wanting in *Welsh* are present here. The ESP directly affected her job responsibilities and privileges by revoking Officer Liedtke's ride-alone privileges and moving her back to a stage of training from which she had graduated eight months prior. It jeopardized her path to complete her training period successfully and become a full officer within the 15-month training period. And it came with a significant "diminution in prestige or change in standing among … coworkers," who could see not only that she had

been knocked back in her trainee progress and had her ride-alone privileges revoked, but who also understood that this demotion had been based on their false and explicitly retaliatory reports. Her fellow officers knew that vis-à-vis their conflicts with Officer Liedtke, Sergeant McBee had their back, emboldening their ostracism of her. She engaged in protected activity, they lodged false counter-accusations against her, and the supervisors visibly and publicly took their side, with meaningful consequences for her job privileges and responsibilities and her progress and future in the trainee program. The intent and effect was to ostracize her for having complained.

To a reasonable officer in Liedtke's position, the message was clear: keep complaining or complain again, and you will be identified as the problem, have your privileges and responsibilities diminished, and have your prestige and standing diminished while those about whom you complained are emboldened.

Even as to the discriminatory adverse action analysis, *Welsh* expressly relied on the fact that the discipline "did not result in a material loss of job responsibilities" and that defendant "did not revoke any of [plaintiff's] privileges or responsibilities," and "did not transfer or

demote" her. 941 F.3d at 825. Officer Liedtke's case is distinguishable on this basis, because the ESP constituted a revocation of her long-since granted privilege/responsibility to ride solo as a patrol officer. It essentially moved her eight months backward in her training program and jeopardized her ability to graduate from trainee status. In context, the import of the ESP was that she would stop reporting her fellow officers, not go to the EEOC as they feared, and either "get with the program" or not complete her trainee period.

*Lemonia* is likewise distinguishable, for many of the same reasons. The court in *Lemonia* disposed of the plaintiff's retaliation claim partially on the grounds that the PIP he had been placed on ten months before he resigned was not an adverse employment action. The court noted that a PIP does not constitute an adverse employment action if it does not "affect job title, grade, hours, salary, or benefits or cause a diminution in prestige or charge in standing among … coworkers." *Lemonia*, 2023 WL 6878915 at *7 (internal quotations omitted).

The court held that, since there was no evidence that the plaintiff's placement on the PIP affected his employment otherwise, it did not constitute an adverse employment action that could support his

17

retaliation claim. Accordingly, the court rightfully affirmed the district court's conclusion that the plaintiff's placement on a PIP "without more" did not constitute an adverse employment action. *Id*.

The facts in *Lemonia* are starkly different from the case at bar. Here, there is undoubtedly "more" than just Officer Liedtke being placed on an ESP. As previously discussed, the ESP effectively revoked her longstanding privilege and responsibility to serve as a solo patrol officer. This action essentially set her training progress back by eight months and risked her graduation from trainee status. This is in addition to the context surrounding the inception of the ESP, including the fact that the ESP followed approximately one week after Officer Liedtke made a protected complaint (ROA.2768-2770), was triggered by coworkers' expressly stated fear of her filing an EEOC charge (ROA.2770), was adopted verbatim by Sergeant McBee from the accused officers' inaccurate texts about alleged long-past and previously addressed incidents (ROA.2771–2779), bypassed normal vetting (see, e.g., ROA.2778; ROA.2774-2777; ROA.6366), and was expanded upon post-issuance to defend management, including adding an incident Appellant had previously cited as harassment.

The City's reliance on *Welsh* and *Lemonia* is misplaced, and an evaluation of these cases demonstrates all the ways in which they are significantly distinguishable from the case at bar. While all of the cases admittedly involve performance plans, there is much more context here that renders ESP a materially adverse employment action that would dissuade a reasonable officer. Under *Burlington*, this "[c]ontext matters."

## III.   **The ESP was indisputably an "action"**

Appellee relies upon *Muttahottil v. Gordon H. Mansfield*, 381 F. App'x 454, 458 (5th Cir. 2010) (per curiam) for the proposition that retaliatory intent "without any subsequent retaliatory act" does not violate Title VII's antiretaliation provision. Appellee Br. At 27. But the ESP was indisputably *an* action. The issue is whether or not it was materially adverse.

The mere fact that intent and materiality are separate elements does not abrogate that *Burlington* requires consideration of the full context in applying the objective test of whether a reasonable employee would be dissuaded from making or supporting a charge. While the intent element looks to the defendant's state of mind, the material adversity element looks to the plaintiff's state of mind. Thus, while defendant's

19

intent alone is not enough to satisfy the material adversity element, where there is an action taken in retaliation (i.e., the ESP), the material adversity analysis looks to *all* of the context to determine whether a reasonable worker in plaintiff's position would be dissuaded by that action. Nothing in *Burlington*'s "context matters" test for this objective element mandates that evidence of context that is also relevant to another element—intent—must be ignored.

## IV. <u>Appellant has not waived her discrimination or constructive discharge claims.</u>

Appellant's opening brief admittedly focused on her retaliation claim for the simple reason that an adverse employment action is defined "slightly more broadly" under the anti-retaliation provision than under the discrimination provision. *Welsh*, 941 F.3d at 826. The anti-retaliation claim is thus the stronger appellate issue both because of the explicitly stated retaliatory intent and context of the ESP, but also because the legal standard is broader and so the anti-retaliation claim will often be stronger. The opening brief understandably focused on the stronger argument. Nonetheless, Appellant did not waive her hostile work environment or sex discrimination arguments; her opening brief presented a comprehensive, interrelated challenge.

The same facts support the hostile work environment and discrimination claims as support the retaliation claim. These facts were adequately briefed and cited, only the narrower legal standard for "adverse employment action" in the anti-discrimination clause is different.

The opening brief set out extensive facts of pervasive sexist hostility, ostracism affecting safety, specific protected complaints to the new sergeant, and the rapid and highly-irregular issuance of an ESP copied from male officers' texts.

Appellant's brief cited the pervasive sexist conduct, ostracism, and safety-impacting refusals to back up Officer Liedtke(ROA.2540; ROA.2626; ROA.2635; ROA.2646; ROA.6384; ROA.6771-6781; ROA.6987; ROA.7288-7294; ROA.7489; ROA.7515; ROA.7719.), as well as her strong evaluations under previous supervisors (ROA.2670–2703; ROA.2711). This comprehensive approach preserves the issues and rebuts the City's waiver narrative.

On de novo review, Plaintiff presented sufficient evidence that a reasonable jury could conclude that the unprecedented ESP was discriminatory, and that its reinforcement and supervisory endorsement

21

of Officer Liedtke's ostracism by her male shift mates presented a safety risk that left Officer Liedtke with no choice but to resign or continue working in unsafe and hostile conditions. The egregiously retaliatory, unjustified, and unprecedented nature of the ESP support a unified challenge to the district court's determination of no adverse-action as to discrimination as well as retaliation.

Appellant's analysis of what the ESP was, why and how it was issued, and its career-affecting posture applies across claims. The facts in the brief apply to both analyses, and Appellant's opening brief adequately briefed the different legal standards that apply to the discrimination claim. *See* Appellant's Br. at 10—30 (factual support applying to all claims); Appellant's Br. at 60—67 (legal analysis of discrimination claims).

Appellant challenged the adverse-action determination in a single, integrated analysis. The opening brief argued that the court improperly applied anti-discrimination standards to a retaliation claim and failed to conduct *Burlington's* context-specific inquiry. The same factual analysis showing how the ESP operated in practice—its origins in retaliatory animus, procedural irregularities, and reputational/career

consequences—necessarily informs the adverse-action inquiry for discrimination as well.

The City faults citation placement. But appellate briefing is judged as a whole. Appellant's opening brief supplied detailed record citations (more than 80 citations to the record) across the Statement and Argument, including to ROA pages for the EEOC-fear admission (ROA.2770), the copied-and-pasted ESP language (ROA.2771–2779), BWC contradictions (ROA.6896–6916; ROA.2772–2777; ROA.6170 at n.149[3]), and the unprecedented retrospective use of an ESP to re-address long-past and previously addressed incidents (ROA.2736–2737, ROA.6973–6985).

As Officer Liedtke testified, and as cited in Appellant's opening brief, the egregiously retaliatory endorsement of her shiftmates' false narratives after she had complained to Sergeant McBee that the same shiftmates' ostracized her and put her safety at risk by willfully refusing to back her up on calls led her to reasonably conclude that her choices were either to resign or to continue to work under conditions that were

---

[3] Exhibit 17 to Docket 50 cannot be located in the record on appeal, but footnote 149 accurately quotes the relevant deposition.

not only hostile to her ability to do the job but that put her safety and the safety of crime victims at risk. *See* ROA.6571; ROA.7306-7308; ROA.7355-7357.

In this context, the retaliation combined with the prospect of continuing ostracism that endangered herself and others constituted intolerable working conditions in which a reasonable person in similar circumstances would have felt compelled to resign. *See Bailor v. Taylor*, 170 F. Supp. 2d 466, 471 (D. Del. 2001); *Downey v. Isaac*, 622 F. Supp. 1125, 1133 (D.D.C. 1985), aff'd, 794 F.2d 753 (D.C. Cir. 1986) ("[I]n a retaliatory constructive discharge case . . .[the] retaliation constituted intolerable working conditions in which a reasonable person in similar circumstances would have felt compelled to resign."). Such constructive discharge meets the "adverse employment action" standard for discrimination as well as for retaliation.

In addition, as argued in the opening brief, the persistent disparate treatment—refusal to ride with her, refusal to back her up on calls, bullying in show-up and show-down meetings—involved a meaningful difference in the terms of employment she endured as the sole woman on

the shift, comparable to the persistently disparate conditions faced by the plaintiffs in *Hamilton v. Dallas Cnty.*, 79 F.4th 494(5th Cir. 2023).

The opening brief's citations are adequate when read as a whole. The operative facts cited in the opening brief are largely applicable to all of her claims, and included well over 80 citations to the record. Appellee's Rule 28 critique ignores this integrated record support and isolates portions of the brief to obscure that the facts and legal arguments supporting Officer Liedtke's discrimination and hostile workplace claim were briefed over nearly 30 pages of her limited space. Indeed, Appellee quotes and relies on the same record core and acknowledges the same timeline and APD policies. The record is squarely before the Court; de novo review can proceed.

## V.    **The *McDonnell Douglas* argument was not waived.**

The *McDonnell Douglas* question is a pure legal issue; in any event, the Rule 56 totality warrants reversal. Appellant's opening brief explained that the court granted summary judgment by applying *McDonnell Douglas* exclusively and urged a Rule 56 assessment that accounts for direct evidence and the full evidentiary record. Even if the

framework applies, the record raises a genuine dispute on material adversity.

The City argues forfeiture and irrelevance. Appellant raised the issue as a legal challenge to the framework's exclusive use at summary judgment and its incompatibility with Rule 56 where direct evidence exists. Appellant's opening brief explained that the district court "exclusively" applied *McDonnell Douglas* to grant summary judgment on both discrimination and retaliation without undertaking a stand-alone Rule 56 assessment, notwithstanding direct evidence tying the ESP to fear of an EEOC charge. That contention is a pure legal issue suitable for de novo review. And even if the Court declines to reach *McDonnell Douglas*, reversal remains warranted under *Burlington's* materially adverse standard on the retaliation claim; the same contextual analysis informs the discrimination claim's adverse-action element.

## CONCLUSION

For the reasons stated above and in Appellant's Opening Brief, the judgment should be reversed and the case remanded.

Respectfully submitted,

*s/ Holt M. Lackey*
Holt M. Lackey
State Bar No. 24047763
holt@holtmajorlackey.com
HOLT MAJOR LACKEY, PLLC
111 W. Anderson Ln., Ste. D-211
Austin, TX 78752
(512) 949-9598
**ATTORNEY FOR PLAINTIFF-
APPELLANT SAMANTHA LIEDTKE**

27

## CERTIFICATE OF SERVICE

I certify that on February 20, 2026, I filed and served a true and correct copy of this brief via electronic service through the Court's CM/ECF system on all parties through counsel of record.

/s/ *Holt M. Lackey*
Holt M. Lackey

## CERTIFICATE OF COMPLIANCE

I certify that:

1.    This motion complies with the type-volume of FED. R. APP. P. 32(a)(7)(B) and Fifth Circuit Local Rule 27.4 because it contains 4,690 words, excluding any portions exempted by FED. R. APP. P. 32(f).

2.    This motion complies with the typeface and type-style requirements of FED. R. APP. P. 32(a)(5) and (a)(6) because it was prepared in Microsoft Office Word for Microsoft 365 in 14-point font, Century Schoolbook type style, except for footnotes, which are in 12-point font as permitted by Fifth Circuit Rule 32.1.

/s/*Holt M. Lackey*
Holt M. Lackey